Good morning Chief Judge Gregory. Good morning. Judge Keenan, Judge Floyd. May it please the court my name is George Harper I represent the appellant in this case Damon Wilson. Summary judgment should not have been granted in this case for two reasons. One, a jury question was presented. Two, a genuine dispute of Mr. Wilson by Officer Gill was not objectively reasonable for several reasons. Mr. Wilson never pointed the knife at anyone but himself. He never threatened the police officer or anyone else with that knife. The district court opinion and order recites that as a fact and there are also affidavits in the file that indicate that. To the contrary, Mr. Wilson was attempting to stab himself when he was shot. He was attempting suicide. Moreover, at 20 feet when he was shot, according to Mr. Wilson, at 20 feet, Officer Gill's gun had already been drawn. The sequence of events that's relevant to that fact is that while Mr. Wilson, beyond the 20 feet point, had been approaching Officer Gill, Officer Gill had given him several commands and had drawn his gun when he had refused to drop the knife, which was one of the commands. So that fact already is also in the district court's opinion. So what we know is that at the point that Mr. Wilson stopped, the gun was already drawn and ready. And that's where he found that Mr. Wilson was 20 feet away at the time that he stopped and that before he stopped, the gun was already drawn and ready. Then Officer Gill had plenty of time to defend himself even if Mr. Wilson had committed some sort of threatening act toward Officer Gill. Note that I am not conceding that he did threaten him. I'm simply asserting the argument that it's extremely important that the gun was already drawn and ready. Mr. Harper, I'm struck by the fact in this case that there were five shots fired. Yes. Does the record show what happened? Is there testimonies to what happened? Did any of those shots actually hit Mr. Wilson? Yes. Okay, which ones? In other words, did the first shot hit him? Several shots hit him. He was paralyzed from the waist down. But did the first shot hit him? That's what I want to ask. We don't know. We don't know. And the shots were rapid fire. They were not separated by any significant period of time. Okay. So in emphasizing the distance of 20 feet, are you saying that that is a conflict with the expert testimony? Because the expert testimony seemed to rely on pulling the gun out of a holster and how long it would have taken. And you're saying since the gun was already out of the holster, you have a dispute as to the, really, whether the expert testimony has any value in this. Exactly. Okay. So in this first section of the argument, because he was attempting to stab himself and was attempting suicide, it seems an unassailable proposition that shooting someone who is attempting suicide is excessive force. With regard to the... Are you making that as a per se argument? I think I would like to. I think I would like to. Our brief doesn't depend upon that. I don't need to make that. I don't believe that. You don't want to take more than you have to. If you want to take more than a highway than you need, go ahead. With regard to the genuine dispute as to material fact, the officer indicates that he was 8 to 15 feet away at the time that Officer Gill shot Mr. Wilson. It strikes me as odd that one would adopt a judgment that is 100 percent in error. In other words, 8 to 10 feet, that sounds like an estimate someone would make. 8 to 15 feet, not really. But I'm not here to assail the credibility of the officer. Isn't that underscoring your point about whether this is a jury question? Yes. I mean, you can't undermine the credibility of a witness in front of this court. You can only point out that they're disputes, right? And I'm not here to undermine his credibility. I'm simply here to point out that a jury could find that that's not credible. And Mr. Wilson says it happened at 20 feet. A jury could well find, even though I would disagree with this proposition, a jury could well find that at 8 feet, it was reasonable to shoot the plaintiff, excuse me, Mr. Wilson, even though he wasn't at that point threatening the officer. I'm not saying that's a position supported by the law. I'm simply suggesting that different jury results could obtain based upon whether or not the jury accepted the 8-foot estimate or the 20-foot estimate. Really, what difference does that make in the guy's girlfriend? He slapped her, he left, went and got a knife. The woman was right behind him. How does he, why can't he objectively reason that he might be coming after the girlfriend again with that knife and kill them both, himself and the girl? What the officer was able to observe was that my client never pointed the knife at the girlfriend, never pointed the knife at the officer, and only pointed it at him and, in fact, tried to stab himself. But he wouldn't drop the knife, and he said he was not going to drop it. That's right. And then the only action that he undertook thereafter was to stab himself repeatedly, which the officer even admits made it appear as if he was injuring himself. Interesting. Is there any way in the record where, from Judge Floyd's question, is there any way in the record where the officer instructed the girlfriend, the lady, stay in the house, get back? I mean, yesterday they cordoned off, they shut down North and Southbound 95 because there was a man who threatened to commit suicide on a car. They stopped people in cars, North and Southbound. This lady here, she was the object of the slap, right? Correct? Is there any record that he said, lady, get back in the house? Is it right? I'm asking him. I did not see that. In other words, as a matter of fact, he allowed that the lady came around and approached your client at some point, didn't she? Didn't she get closer to your client? You know the record, don't you? No. She didn't approach him? She was on the porch. She never approached him? Behind the police officer? No. Was she ever told to go inside? No. All right. I didn't hear the record either. In other words, it was that much fear. I mean, you're protecting her. First thing I said, ma'am, get in the house, close the door, lock the door. I don't see that in the record at all. No. I mean, in terms of trying to protect her, it's not a situation where she's behind him, he's coming forward, there's no for her to go, right? Go in the house. According to the record, the police officer was actually between the two. Right. Exactly. But the house was behind her. They were on a porch to the front entrance of a multi-unit dwelling. And so she could have stepped inside. And did he come from a long distance? Oh, yes. He came from a different neighborhood and followed down a path, a marked path, a sidewalk, and got within 20 feet when he was shot. But at the time he was shot, he was stabbing himself, and he said he was stumbling forward from the pain that he was in. From the pain. And the officer does not dispute that. I saw it. It was not disputed. And he had called for backup, correct? I believe so. And he shot him before backup could get there? Yes. Okay. There is a new case that came out before the briefs in this case were filed. It is a new Fourth Circuit case. It is Hensley v. Price. It was handed down 17 November 2017. I have the number. It's number 16-1294. I don't know if it has a proper site yet because it's so new. But in that case, Hensley was shot because he was holding a gun. He never threatened the deputies, similar to this case, with that gun. It was held in that case, Fourth Circuit case, that it was unreasonable to use deadly force or to assume that the assailant or the suspect posed a threat merely because he held a weapon. And Hensley relied upon an earlier case cited in our brief, Cooper v. Sheehan, also a Fourth Circuit opinion. In that case, it was held that mere possession of a deadly weapon is not enough to permit use of deadly force, and that involved a shotgun. It is significant that this case involves a knife, something which ordinarily at 20 feet is rather harmless. The lower court relied upon a case, Sigmund v. Chapel Hill. But in Sigmund, the suspect broke a window in full view of the officers who shot him and threatened to kill the police and a third party. In this case, no such threats were issued by Mr. Wilson, and Sigmund was 10 feet away when he was shot. The district court, the lower court, also relied upon Ngong v. Montgomery County, N-J-A-N-G, and that's also a Fourth Circuit opinion. But Ngong was shot when he was only two feet away, and he had already resisted a frisk and escaped from a frisk. And he had also pointed a box cutter at the officer, backed the officer back to her cruiser. So, he was obviously threatening the officer with the box cutter at the time. And the lower court, the district court also relied upon Miner v. Prince George's County, but in Miner, Miner reached for a gun when he was shot. In this case, there's no allegation that my client reached for a gun. There is the minor issue of qualified immunity. In this case, the law is not in doubt, and the officer, the rights in question, the Fourth Amendment rights are clearly established. But one could, as the appellee cleverly has done, one could always draft narrow, narrow, fact-specific questions to ask whether an officer understands that in this case, the law is applied in this manner. But that's really not the issue in qualified immunity. Qualified immunity has to do with whether or not the rights are clearly established, the Fourth Amendment is clearly established, and the fact that it protects against excessive force is clearly established. So, qualified immunity was not available. And with regard to the state torts, which are ancillary to the federal constitutional torts, the Maryland law is very clear, and I've cited Lee v. Kline in the brief, Maryland law is very clear that qualified immunity does not apply to a defendant who is not a state employee, and that was not the case here. Thank you. Thank you, counsel. Mr. Teferi. Good morning, Judge Gregory, Judge Keenan, Judge Floyd. My name is Guestas Teferi, and despite my nervousness, this is an honor to appear before this court. I represent Officer Gill in Prince George's County, and I ask the court to affirm the grant of summary judgment. The lower court was correct when it ruled that there were no material disputes of fact, and that the officer's use of force was reasonable. So it doesn't matter if it was 20 feet away? Well... It'd have to be argued in that, right? Yes, yes, absolutely, Your Honor. Make sure you argue it, because you said it's 20 feet away. So go ahead. Go ahead, and Judge Keenan has a question for you. Yes, and I wanted to ask you, same question I asked Mr. Harper, although maybe I didn't ask it very clearly. There were five shots in this case. Yes, Your Honor. Obviously, some of them hit him because he's sterilized. Three struck. Do we know which shots hit him of the five? We do not. We do not. There's nothing in the record that indicates which gunshot struck the appellant. Where was he struck? I'm sorry? Where? What part of his body? One struck him in the abdomen, one struck him in the arm, and I'm not sure where the third... So we know one was center mass? Yes. In the stomach and torso area? Yes. But we don't know about the others? Why not? No, Your Honor. One was in the arm. It's not in the record, is it? It's not in the record, no, Your Honor. It's not in the record. You're saying the record shows that two shots hit him? There were three shots that struck him. Okay. Yeah. Well, then that brings up my point. Why in the world would you have a basis or think if you've already hit somebody once, what would be the basis for firing another shot at them? How could that possibly be reasonable? There's nothing to indicate that the officer shot, waited, shot again, waited, shot again. This is a rapid fire, as counsel indicated. There was, as soon as the officer shot, he shot as quickly as he could and stopped when the appellant fell. But he knew the man was trying to kill himself. He did not, Your Honor. He didn't... And then he said he saw him go... Exactly. The officer... The officer said he saw that. Officer saw him trying to... What do you think it means if somebody's holding a knife and they're trying to do like this? Does that mean trying to kill themselves? Yes. Even if it did, he didn't drop, Your Honor. He slit his throat, continued moving towards the officer and the ex-girlfriend that was behind the officer. But didn't he also stab himself in the chest? He stopped at 20 feet. According, if you give credence to the appellant's affidavit, he stopped at 20 feet. He struck himself three or four times and one of the last pokes hurt enough to cause him to go forward four steps. So he was really not at 20 feet. Even if he's stumbling forward, he's... Yeah, but he's stumbling. Otherwise, someone is stabbing themselves in the chest. That is near the heart. That's pretty... And the throat is near the jugular. So they're all fatal attempts of stabbing. You agree with that? Yes, Your Honor. He's not like cutting his arm. So he's near his jugular. He's near his heart. And you see him there and you shoot him five times. He still doesn't fall, Your Honor. He's still... He hasn't fallen yet because he's still stumbling. But he's... But you got to accept that, remember? Remember, we're not here to determine fact disputes. He's 20 feet away, trying to cut his throat, stabbing himself in the chest, stumbling forward, and you shoot him five times. You got to accept that now. You tell me why that's not unreasonable. It's not an... Excessive is a better word. Exactly. It's not excessive because as he does all those acts, he's still approaching the officer. Stumbling. Stumbling forward to the officer and the people behind him. Isn't that a jury question as to what his intent... In other words, was he threatening the officer then or not? Or was he merely a person bent on doing harm to himself, stumbling forward? And isn't that a classic question of fact for a jury? I don't believe so, Your Honor, because the officer doesn't... He's not verbalizing what he's intending to do as a connor. The connor, this court... No, but I'm saying as to whether this man... Whether this man presented a threat, Mr. Wilson, why isn't that a classic jury question? Was Mr. Wilson really attacking, or could the officer have reasonably perceived that Mr. Wilson was attacking him? Or was this a man stumbling in the act of trying to kill himself? Well... Why wouldn't that make a big difference? And why isn't that a... It seems to me it's a classic jury question. I don't believe so, Your Honor, because he has disobeyed the officer's command several times to stop, to drop the knife. He never obeyed... If he was 100 feet away and the officer said, drop the knife, he still would be disobeying, wouldn't he? Yes, yes. Do you think the officer could shoot him five times 100 feet away? No, Your Honor. Well, then that's what I'm saying. What does 90 feet closer mean if, in fact, there's a question of whether or not he's stumbling after trying to kill himself? And it's clear on the record, Your Honor, that the officer waited. When he saw him about 40 feet, when he pulled his knife, he took his gun out and ordered him, stop, drop the knife. So he had his gun out at 40 feet. Yes, and he allowed him to get closer to the officer and the people behind him. And the officer indicated that he kept on backing away until he was to the... right in front of the apartment entry. And even at that stage, Mr. Wilson kept approaching him. The officer had indicated that he initially, when he approached Mr. Wilson, he told the ex-girlfriend, go inside, but she remained behind him. Her family members came out, and he indicated on the record, I believe, joint appendix 70... His own appendix is on the record. Yes, joint appendix, I believe, 75, that he did not know why Ms. Johnson, the ex-girlfriend, or the family members were out there and behind him. And he had no option when he kept on backing up. Once he was in front of the apartment door, he did not have any other options. He was not an avenue escape. He could have run inside an apartment. He could have run inside an apartment unit to do whatever... Did he have a taser unit? He did not, Your Honor. He was not... He did not have a taser. He had a baton, but he... Oh, he had a baton? He had a baton, but he considered the baton was ineffective because Mr. Wilson was armed with a knife. He had a... He's armed with a knife, but stabbed himself in the chest. Yes, but none of those even... Wouldn't it be a weakened condition? It did not indicate... There's nothing in the record that indicates that he was in a weakened condition. Even after Mr. Wilson slit his throat... What about the expert testimony about the 21-foot guidance? Does that have any bearing? Absolutely, Your Honor. That's an uncontradicted expert report. The expert report indicated that within 21 feet, a person could rush an officer, even with a gun drawn, and depending where the bullets would strike the suspect, the armed suspect, and where the knife in this case... To say that somebody 20 feet away could run towards you. I mean, what's my expert for that? I'm sorry, Your Honor. Anybody knows if you're 20 feet away, I can run towards... How far do you think I am from you now? I'll say about 10, 15 feet. You think I'm 10 feet away from you? 15 feet. Okay. All right. You see how difficult it is to determine that? I understand, Your Honor, but... But I'm saying that you mean it was an expert that said... They hired an expert to say, I could run toward you from where I am now. Did that take an expert to say that? I mean, what did the expert add? Otherwise, people say expert, but what did it add? Well, the expert... Certainly, you can run. If I'm 20 feet from you, yes, I can run toward you. What's the point? Floyd's point... I'm not... No, no, no, it's your point. Yes. You're the one, you're the lawyer. Yes. What is your point? Okay. What I'm trying to get across is, the expert indicated not just that he would run, but if I ran towards you, Your Honor, and if you had a gun and if I had a knife, if you fired that firearm where you would strike me, if it doesn't take me down, I could harm you with the knife that I would hold, that I'll be holding. That's what the expert... Did he have a 10 millimeter or nine millimeter? I'm not sure, Your Honor. Did the expert know what the weapon was? Yes, he did. Okay.  No, I do not. Is it in the record? I believe it is in the record, Your Honor. So you're saying that he was carrying a firearm that didn't have enough knock-down power. I'm pointing the gun at you right there, and you take off at 20 meters with me, and he didn't have a weapon that could, at five shots, knock you down. I find that surprising. Well, I'm not trying to... I'm going to blow a hole like a grapefruit when it came out the back of you. It wasn't the expert testimony predicated on the amount of time it would take to get the gun out of a holster, too? Yes, but he said... So how is the expert testimony of any value to your point of view? It seems to me it's borderline irrelevant, since everybody agrees the gun was out of a holster well before the 21-foot distance. Yeah, but I believe, Your Honor, what the expert report indicated was that the gun, even if he would take it out at 21 feet, for him to just fire five shots at a wrong suspect, depending when those bullets would strike the suspect as he's approaching the officer. If any of those bullets, whether they struck him or not, if they don't take him down, then the suspect could use that knife, and thereafter, not only harm the officer, but then continue to harm the people that were standing behind the officer. In this matter... Doesn't our case law say we're not supposed to use 20-20 hindsight? Absolutely, Your Honor. It's not an armchair reflection. This is a volatile... You said... What did you say, reflection? I'm sorry, Your Honor. What's the last thing you said to Judge Floyd's question? Armchair reflection. The officer in this case... Did you say armchair? Reflection, Your Honor. You mean like Monday morning quarterback? Monday morning quarterback, yes, 20-20. We don't Monday morning quarterback. What we do is we look at what a reasonable officer would do, and that is also a reflection beyond just the officer. We have a reasonable officer who's approaching a person who is not suicidal by ideation. He's suicidal by actual active conduct, which is one, trying to cut his throat. One, he has already stabbed himself in the chest four, three to four times, and he's stumbling, because you got to take that, that he's stumbling. You didn't say he's running. He did like a 20-yard dash, a 20-foot dash, I should say. And that is what we calculate, that a reasonable officer then would fire, send a mass, shoot him five times, a man who's trying to kill himself. It's like somebody being on a bridge. I'm going to jump. So you got to shoot him so you can kill him before he jumps. Right, and then I'm kind of like that, you know, I'm on the bridge, I'm going to jump. Well, I got to, I'm going to shoot you before you jump, and I'll kill you before you commit suicide. Well, in this case, Your Honor, I believe... It may, what are you talking about? In this matter, Your Honor, when the officers responded to the domestic violence call, he knew that Mr. Wilson had battered his girlfriend, that he had broken the door, that he had thrown down her cell phone down the gutter. And told her that he wanted to kill himself. The end of it. No, he never did, Your Honor. He didn't, he didn't say that, he didn't, the conversation with her wasn't about the child. Absolutely not, Your Honor. And when he returned and the officer got on the radio and told dispatch, he, the armed suspect, I'm sorry, the suspect has returned and he's now armed with a knife. And that's on the record. There is no testimony from Ms. Johnson, from Mr. Wilson, that he told anybody that he was trying to commit suicide. So at that point, once he returns and walks towards the officer and Ms. Johnson, who were behind him, her family members come out. Everybody was telling him, drop the knife, drop the knife. Even after slicing his throat, he doesn't fall down, he doesn't stumble. He keeps, he pokes himself in the chest. And he's, this is around October 7th, 2012. So he's not just wearing a light t-shirt, he's wearing a jacket. So the officer can't tell if the knife is going deep into his heart, deep into his chest. There's nothing that indicates that Mr. Wilson was in any way fatally injured or injured to an extent. But at least the officer knew the knife wasn't pointed at the officer. Yes, Your Honor. But I think it's clear that, just like the, I believe it's McLinigan versus Kearney case, where the plaintiff in that case was rushing the police officer and the officer did not know that the plaintiff was, had a knife in her hand and she shot her when she was about 10 feet away. In the Sigmund matter, Mr. Sigmund was 10 to 15 feet away when the officers shot him. This court also discussed in the Gregory matter, what, once that person approached the officers, he was holding a knife. An officer struck him. He fell down. He did not drop the knife. Officers instructed him to drop the knife. And he was on one knee and when he was about to stand, the officers shot and killed him. And this court found that the officer's use of force was reasonable. And counsel also mentioned the Hensley versus Price. It's 876 F3rd 573. And this court denying, I'm sorry, affirming a denial of qualified immunity. The officers said, if an officer directs a suspect to stop, to show his hands or the like, the suspect's continued movement likely will raise in the officer's mind objective, objectively grave and serious suspicions about the suspect's intentions. Even when those intentions turn out to be harmless, the officer can reasonably expect the worst at the split second when he acts. It's similar to this case, your honors. When officer Gill... Yes, yes. And in that matter, Mr. Hensley and the court, this court explained that the officers never ordered Mr. Hensley to drop the gun, never ordered him to do anything. In this matter, it's clear in the record that officer Gill repeatedly told Mr. Wilson to stop, repeatedly told Mr. Wilson to drop the knife and really told himself to get down to show his hands. He never complied. Never did he comply at all. Counsel also indicated in the Cooper matter, Cooper... But see, the problem is, counsel, it's a good argument, you're letting me have cases, but the difference is those are cases where someone's holding a knife, they don't comply, you don't know what's in their mind or what they're thinking and you never do what they're thinking or what they're doing to move forward. But here, it's clear, I mean, the sense that what he's doing is he's trying to kill himself and not only he's thinking about it, he's doing it. So when you said he's not complying, certainly he's not complying because he's trying to kill himself. In other words, it's like common sense, you said, well, he wasn't compliant. No, because he's busy trying to kill himself. Other cases where you're not complying, you're there, you're right in the police officer's face, put it down, you hold it, put it down. Here, no, I'm busy trying to kill myself, that's why I'm not complying, you see? I mean, if it's just common sense, you take these cases out of context. He's busy killing himself and he can see it. That's why he's not complying. It's not hard to think about it. I wonder why he's not complying here. Look, he's killing himself, sad case. But so you go these litany of cases, you can't just throw common sense out the way. That's what he's doing. That's why he's not complying because he's trying to kill himself. Maybe he's crying out for help, but he's killing himself in the meantime. But isn't that a jury question, whether or not 20 feet away, that would be the response as a reasonable objective officer would say, I see him trying to kill himself. He's stumbling forward. You shoot him five times, hit him three, and he's paralyzed. And he's not 20 feet away, as I indicated earlier, Your Honor. He took about four steps towards the officer before the officer struck him. That's what Mr. Wilson indicated. Do you think a person would stumble after they just stabbed himself in the chest? I would imagine so, yes, Your Honor. But even after he slit his throat, he didn't stumble, Your Honor. That's what I'm trying to inform the court. He slit his throat. That didn't work. He still stabbed himself. That didn't drop him at all. He kept on progressing towards the officer and Ms. Johnson, who was behind. And this is the officer, Gil, was facing a situation in a domestic violence case where the suspect, after he battered her, after he left, once he was taken the information down from Ms. Johnson, returned armed with a knife. And I think it would be reasonable to believe that once the suspect who had battered Ms. Johnson returned, not only might he have been committing self-inflicted wounds, but he could also harm Ms. Johnson. I think that's reasonable to assume in this matter. Your time has taken away. Yes, Your Honor. Yeah, I was waiting for a question. Regarding to qualified immunity, Your Honor, I believe I indicated in my brief that since Officer Gil's actions were reasonable under the circumstances and the facts that he was facing, there's no reason for the court to do the two-step analysis. And regarding the state constitutional claims, since they're also based on the officer's reasonableness, officer's use of force, whether they were reasonable or not, since they were based on the same analysis, that the court properly granted summary judgment on those counts as well. This is the case, Your Honors, where it indicates in the Connor matter, the dissent in the Connor matter indicated that, just as Judge said, the deputies were responding to a domestic disturbance call, which involved an armed individual acting irrationally, just like Mr. Wilson was in this matter. And Judge Shred said This is similar to this case, Your Honors.  rapidly moving situation where his actions and his perception that he believed that Mr. Wilson was an aggressor, that he believed that he was under threat, people behind him were under threat, was reasonable, and I would ask the court to affirm the grant of summary judgment. Thank you. Thank you, counsel. Thank you. Mr. Hoffer, you have some time. I won't take all of my time. I have only two things to add. Let me ask you a question. Yes. Why, in this record, do we not know what the extent of the injuries were that they were self-inflicted? Outside of the record, I can tell. No, why don't we know in this record what the extent of the self-inflicted wounds were? You know what I'm asking, don't you? If there had been, I can say hypothetically, outside of the record. It's not a hypothetical question. This is quite, it is not counterfactual either. It's a question about the record. Why do we not know the extent of the self-inflicted wounds of your client in this record? He was unsuccessful in penetrating his skin. He hurt himself physically in the same way that a blunt object would hurt the chest. But the knife never penetrated the clothing and the skin. So there was no blood. There was no apparent injury. And he tried cutting his knife, tried stabbing, was unsuccessful. I guess I asked a tough question though. Same question. I wonder why the government didn't have it in there either. If I had had a Hollywood moment that I could have used, I would have used it. In chaff, right? Right, I would have used it. Mr. Harper, what basis is there in this record for the intentional infliction of emotional distress claim? Seems to me that's just a huge stretch. What are you relying on here for that? I would agree with the court. And I don't want to waste the court's time on that. I have only two things to add. One is a citation to page 91 because it does indicate that the expert's opinion is based upon the idea that at 21 feet, he uses for some reason, this is a magic number, 21 feet, it is possible for someone to take four steps and cut a police officer before that police officer can pull out his gun. And that's the opinion. And it's page 91 in the record. And I listened with interest to the recitation of all of the acts about which the officer knew that the defendant had committed in the past before the situation had occurred. All of those acts that he had allegedly committed, the assault upon the young lady who was behind the officer, all of those acts that had committed before the officer even saw this gentleman, all of those acts would be relevant to the issue of probable cause for an arrest. But no arrest was attempted in this case. Lethal force was used, which, and in lethal force, the question is not what threats occurred in the past, but what threats are occurring in the present. And obviously, he was not threatening the officer. He was simply attempting to commit suicide. Thank you, Your Honors. Thank you, Counsel. I'm going to ask the clerk to adjourn the court. Sani Dye will come down and greet Counsel. This court stands adjourned. Sani Dye, God save the United States and this honorable court.
judges: Roger L. Gregory, Barbara Milano Keenan, Henry F. Floyd